IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DAVIS MORENO CONSTRUCTION, INC., | ) ) ) | No. CV-F-08-854 OWW/SMS |
| | ) ) | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION (Docs. 42 and 49) |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| FRONTIER STEEL BUILDINGS CORPORATION, | ) ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

By Memorandum Decision filed on May 26, 2009, (Doc. 37) Defendant Frontier Steel Buildings Corporation's ("Frontier") motion to dismiss the Amended Complaint filed by Plaintiff Davis Moreno Construction, Inc. ("Davis" or "DMCI") for lack of personal jurisdiction and for change of venue or to transfer was denied.  The Order denying Frontier's motion was filed on June 10, 2009.

On June 23, 2009, Frontier filed a motion for reconsideration pursuant to Rules 52 and 59, Federal Rules of

1

Civil Procedure.

Davis contends that Frontier's reliance on Rule 52 and 59 in seeking reconsideration is misplaced.  Rule 52 pertains to findings of fact and conclusions of law and judgment on partial findings.  Rule 59 pertains to a new trial or altering or amending a judgment.  The Court denied Frontier's motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), Federal Rules of Civil Procedure; there are no findings of fact and conclusions of law or judgment on partial findings, nor was there a trial or a judgment to be altered or amended.  In addition, both of these rules contain time limits, i.e., motions under these rules must be filed no later than ten days after entry of judgment.  Davis argues that Frontier's motion should have been based on Rule 60(b), Federal Rules of Civil Procedure.

Frontier replies that Rule 52 applies to Rule 12 motions. Frontier refers to Rule 52(a)(3):

> The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on any other motion.

Frontier also refers to Rule 52(b):

> On a party's motion filed no later than 10 days after the entry of judgment, the court may amend its findings - or make additional findings - and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59.

Frontier also refers to Rule 59(e): "A motion to alter or amend a judgment must be filed no later than 10 days after the entry of the judgment."  Frontier construes these provisions as applying

2

to a Rule 12 motion and cites *Beentjes v. Placer County Air Pollution Control District*, 254 F.Supp.2d 1159, 1161 n.2 (E.D.Cal.2003) for the proposition that Rule 59(e) permits motions for reconsideration even though no trial has taken place. Frontier asserts that "[s]uch an application of the rule would permit additional evidence or hearing."

*Beentjes* involved a motion for reconsideration after denial of the defendant's motion for summary judgment.   Judge Damrell stated:

> Defendant's motion, brought pursuant to both Rule 59 and 60, is titled 'Notice of Motion and Motion to Alter Order and/or Motion for New Trial and/or Motion for Reconsideration.' While defendant periodically requests a 'new trial' in addition to relief from the court's December 23, 2002 order throughout its motion, the court notes that no trial has taken place in this action.   Thus, the court disregards defendant's request for a new trial and interprets defendant's motion as one for reconsideration pursuant to either Rule 59(e) or 60(b).

Frontier also cites *United States v. Westland Water District*, 134 F.Supp.2d 1111 (E.D.Cal.2001), which considered Rules 59(e) and 60(b) in addressing a motion to reconsider a ruling on cross-motions for summary judgment.   Frontier relies on this authority to argue that the Court need treat this motion for reconsideration as a Rule 60(b) motion.

Resolution of the appropriate procedural basis for this motion is unnecessary.   Denial of a motion to dismiss for lack of personal jurisdiction is an interlocutory order; it is not immediately appealable absent certification by the District Court

3

for interlocutory appeal.  *Cassirer v. Kingdom of* Spain, 580 F.3d 1048 (9th Cir.2009); Lucas *v. Natoli*, 936 F.2d 432, 433 (9th Cir.1991), *cert. denied*, 502 U.S. 1073 (1992).    Because the Memorandum Decision and the Order are interlocutory, discretion exists to reconsider.  *Kern-Tulare Water Dist. v. City of Bakersfield*, 634 F.Supp. 656, 665 (E.D.Cal.1986), *aff'd in part and rev'd in part on other grounds*, 828 F.2d 514 (9th Cir.1987), *cert. denied*, 486 U.S. 1015 (1988).  "[T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."  *Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 123 F.R.D. 282, 288 (N.D.Ill.1988).  "Courts have distilled various grounds for reconsideration of prior rulings into three major grounds for justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) need to correct a clear error or to prevent manifest injustice."  *Kern-Tulare Water Dist., id.*.  Pursuant to Rule 78-230(k)(3), Local Rules of Practice, the party seeking reconsideration has the duty to indicate "in an affidavit or brief, as appropriate," "what new or different facts or circumstances are claimed to exist which did not exist or were not shown upon such prior motion, or what other grounds exist for the motion,' and "why facts or circumstances were not shown at the time of the prior motion."

Davis does not respond to the substantive arguments made in the motion for reconsideration.  Davis contends that the motion

is procedurally defective because no affidavit has been submitted pursuant to Rule 78-230(k)(3) and that Frontier's motion is in essence re-arguing its prior motion, relying on the same evidence and arguments.

An affidavit is not necessarily required; Rule 78-230(k)(3) allows the basis for reconsideration to be stated in a brief. Frontier further requests the Court take judicial notice of the affidavits and briefs filed in connection with the motion to dismiss.

Frontier seeks reconsideration of the decision not to enforce the choice of law clause in the final Purchase Order that "[t]his PURCHASE ORDER shall be construed and enforced under the laws of the State of Colorado."  In denying Frontier's motion to transfer the action to the United States District Court for the District of Colorado pursuant to the doctrine of *forum non conveniens,* the Memorandum Decision ruled in pertinent part:

> Colorado has a substantial relationship to the parties and to the transaction.  Frontier is domiciled in Colorado, the engineering and fabrication of the steel building by Frontier occurred in Colorado.
>
> Because Colorado has such a substantial relationship, it  must be determined whether Colorado's law is contrary to a fundamental policy of California.  Restatement Second of Conflict of Laws, § 187, Comment g, provides:
>
> > To be 'fundamental,' a policy must in any event be a substantial one. Except perhaps in the case of contracts relating to wills, a policy of this sort will rarely be found in a requirement, such as the statute of frauds, that relates to

5

> formalities ... Nor is such a policy likely to be represented by a rule tending to become obsolete, such as a rule concerned with the capacity of married women ..., or by general rules of contract law, such as those concerned with the need for consideration ... On the other hand, a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power. Statutes involving the rights of an individual insured as against an insurance company are an example of this sort ... To be 'fundamental' within the meaning of the present rule, a policy need not be as strong as would be required to justify the forum in refusing to entertain suit upon a foreign cause of action under the rule of § 90.

Davis contends that California public policy favors the application of its own laws to those contracts which are to be performed in California, citing California Civil Code § 1646:

> A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.

Section 1646 does not articulate a fundamental policy of the state of California; Section 1646 may be negated by a valid choice-of-law provision in a contract.

Davis, noting that the FAC alleges that Frontier did not possess a California contractor's license, contends that California public policy generally requires those who work in California to be licensed by California.  California Business &

Professions Code § 7026 provides that, for purposes of the license requirements:

> 'Contractor' for the purposes of this chapter, is synonymous with 'builder' and, within the meaning of this chapter, a contractor is any person who undertakes to or offer to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building ... or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith, ... and whether or not the performance of work herein described involves the addition to, or fabrication into, any structure, project, development or improvement here described of any material or article of merchandise. 'Contractor' includes subcontractor and specialty contractor ....

California Business & Professions Code § 7031 provides:

> (a) Except as provided in subdivision (e), no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where is license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the person, except that this

7

1    prohibition shall not apply to
     contractors who are each
2    individually licensed under this
     chapter but who fail to comply with
3    Section 7029.

4    (b) Except as provided in
     subdivision (e), a person who
5    utilizes the services of an
     unlicensed contractor may bring an
6    action in any court of competent
     jurisdiction in this state to
7    recover all compensation paid to
     the unlicensed contractor for
8    performance of any act or contract.

9    ...

10   (e) The judicial doctrine of
     substantial compliance shall not
11   apply under this section where the
     person who engaged in the business
12   or acted in the capacity of a
     contractor has never been a duly
13   licensed contractor in this state.
     However, notwithstanding
14   subdivision (b) of Section 143, the
     court may determine that there has
15   been substantial compliance with
     licensure requirements under this
16   section if it is shown at an
     evidentiary hearing that the person
17   who engaged in the business or
     acted in the capacity of a
18   contractor (1) had been duly
     licensed as a contractor in this
19   state prior to the performance of
     the act or contract, (2) acting
20   reasonably and in good faith to
     maintain proper licensure, (3) did
21   not know or reasonably should not
     have known that he or she was not
22   duly licensed when performance of
     the act or contract commenced, and
23   (4) acted promptly and in good
     faith to reinstate his or her
24   license upon learning it was
     invalid.

25

26   In *Hydrotech Systems, Ltd. v. Oasis
     Waterpark,* 52 Cal.3d 370 (1991), the Supreme

8

Court held that Section 7031 barred an action by an out-of-state corporation that subcontracted to provide labor and materials for a wavemaking machine in a water park project against the project's owners to recover its payment, regardless of the unique nature of the service provided or the fact that it was an isolated transaction in California.   The Supreme Court explained:

> The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services ... The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business ....
>
> Section 7031 advances this purpose by withholding judicial aid from those who seek compensation for unlicensed contract work.  The obvious statutory intent is to discourage persons who have failed to comply with the licensing law from offering or providing their unlicensed services for pay.
>
> ...
>
> Hydrotech claims the law's interests in competence and public protection were not disserved in this case because its agreement to design and construct the surfing pool for Oasis was an 'isolated' California transaction.  However, as the Court of Appeal observed, 'It is manifest that the concern for the public inherent in section 7031 is just as applicable to a project done by an out-of-state contractor with few jobs in California as to a project done by

9

> a California contractor who
> performs only one job in California
> before going out of business.'
> That Hydrotech's activities in
> California were 'isolated' is not
> clear from the pleadings, but even
> if they were, there is no implied
> exception for 'isolated'
> transactions by foreign contractors
> ....
>
> Hydrotech also begs the question by
> suggesting that Oasis' need for its
> unique skills should exempt it from
> section 7031.  As noted, the
> licensing law achieves its
> protective purpose by requiring
> that a contractor's competence and
> qualifications, however unique, be
> examined and certified by the
> expert agency charged with the
> law's enforcement.

52 Cal.3d at 995-997.

Contracts by unlicensed contractors "are
considered illegal, i.e., malum prohibitum as
opposed to malum in se."  *Ranchwood
Communities Limited Partnership v. Jim Beat
Construction Co.,* 49 Cal.App.4th 1397, 1409
(1996), citing *S & Q Construction Co. v.
Palma Ceia Development Organization*, 179
Cal.App.2d 364, 367 (1960); *see also MW
Erectors, Inv. v. Niederhauser Ornamental and
Metal Works Co., Inc.*, 36 Cal.4th 412, 435-
436 (2005):

> Generally a contract made in
> violation of a regulatory statute
> is void.  Under this general rule,
> where a law requires, for
> regulatory rather than revenue
> purposes, that one procure a
> license before offering or
> performing certain services and
> provides a penalty for violation,
> the contract of an unlicensed
> person to perform such services
> will not be upheld ... 'This rule
> is based on the rationale that "the
> public importance of discouraging

10

such prohibited transactions outweighs equitable considerations of possible injustice between the parties." ...' ....

*See also* California Business & Professions Code § 7028(a)(making it a misdemeanor for a person to engage in the business or act in the capacity of a contractor within California without having a license); California Business & Professions Code §§ 7028.3, 7028.4 (allowing registrar to apply to Attorney General or district attorney for injunction restraining unlicensed contractor).

California's statutes requiring that contractors be licensed in California is fundamental.  According to the CLSI National Contractor License Service website, in Colorado: "State license required for electrical, asbestos removal, plumbers and pesticides trade; no state license for general contracting.  Licensing may be required on a city or county level."  *See also Walker Adjustment Bureau v. Wood Bros. Homes, Inc.*, 41 Colo.App. 26, 582 P.2d 1059, 1063 (1978)("Colorado does not require state licensing of construction contractors.")  5 *Bruner & O'Connor Construction Law § 1622*, states that "[a]s a general rule, unless a statute provides otherwise, one who has already paid an unlicensed contractor or design professional is not entitled to recover it."  "California is one of the few jurisdictions that statutorily permits a contractee to seek disgorgement of monies paid to an unlicensed contractor."  *Id.* Colorado law is contrary to California's fundamental policy of California of limiting unlicensed contractors.  As Davis contends, "[a]llowing Colorado law to govern would be a vehicle by which out of state contractors could circumvent California's Contractor's State Licensing Law and the policies it seeks to advance among which include offering unlicensed services for pay."

Because of this conclusion, it must be determined whether California has a materially greater interest than Colorado in

11

the determination of the particular issue.
"[A] court can decline to enforce the
parties' contractual choice-of-law provision
only if the interests of the forum state are
'materially greater' than those of the chosen
state, *and* the forum state's interests would
be more seriously impaired by enforcement of
the parties' contractual choice-of-law
provision than would the interests of the
chosen state by application of the law of the
forum state." *Application Group, Inc. v.
Hunter Group, Inc.*, 61 Cal.App.4th 881, 898-
899 (1998).  California's interests are
materially greater than those of Colorado.
Frontier is alleged to be an unlicensed
contractor who performed work on a California
public works project located in California.
California's interests in protecting the
public from unlicensed contractors would be
more seriously impaired if the choice-of-law
provision were enforced.  Colorado has no
commensurate statutory scheme, policy or
interest.

For these reasons, the contractual choice-of-
law provision is unenforceable.  The factor
of the state most-familiar-with governing-law
weighs in favor of Davis for this reason.  As
to the plaintiff's choice of forum, Davis was
entitled by virtue of the forum selection
clause to bring this action in California.

(Doc. 37, 38:22-45:17).

In seeking reconsideration of this ruling, Frontier contends
that DMCI did not allege that Frontier was an unlicensed
contractor who performed work on a California public works
project but, rather, alleged that "Frontier Steel did not possess
a valid California Contractor's License."   (FAC, Paragraph 20).
Frontier contends that DMCI's allegations "are careful to narrow
its scope," referring to the allegation in Paragraph 20 that
"Frontier Steel submitted a bid on a California Public Works
construction project where it offered to construct and erect the

12

subject steel building thereby requiring it to be duly licensed
by the California Contractor's Board;" the allegation in
Paragraph 31 that "Frontier Steel submitted a bid to construct
and erect a steel building in connection with the Project ... and
did not disclose that it did not possess a California
Contractor's License;" and the allegation in Paragraph 32 that
the "suppression of the fact Frontier Steel did not possess a
contractor's license was likely to mislead plaintiff and did in
fact mislead plaintiff in the light of other representations made
by defendant by submitting a bid for work which requires a
contractor's license."  Frontier argues that "[n]owhere does
Plaintiff allege that Frontier, pursuant to its contract - not
its bid, *performed* a specific act in California on the Project
which required a contractor's license."  Frontier contends that
DMCI's affidavits in opposition to Frontier's motion to dismiss
or transfer did not "address the question."  Frontier asserts:

> [N]o fact implicates the California
> contractor licensing statute in this case.
> The allegations of the Amended Complaint,
> Second Cause of Action, as a matter of law,
> do not state facts which place Frontier
> within the contractor licensing disgorgement
> statute.  Section 7031(a) and (b), B&PC,
> contemplates limiting legal actions by a
> 'contractor,' or disgorgement from a
> 'contractor' only for the *performance* of any
> act or contract.' ... (This issue as now
> framed is analogous to Rule 12(b)(6) motion
> to dismiss for failure to state a claim with
> respect to Davis' Second Cause of Action.)

Frontier notes that the Memorandum Decision concluded that "[t]he
evidence does not establish that Frontier and Davis agreed that

13

1  Frontier would erect the building."   (Doc. 37, 22:26-23:1).

2  Frontier contends that its uncontroverted affidavits show that

3  Frontier's sole performance were acts in Colorado to design and

4  pre-engineer the steel building and acquire the steel.   Frontier

5  argues that these were the acts of a supplier, designer and

6  engineer, not a contractor.   Frontier contends that "the record

7  is devoid of facts upon which this Court may base a finding and

8  conclusion of law that the California Contractor Licensing

9  statute may apply to Frontier" and that "[n]o authority has been

10  cited to support the proposition that an out of state supplier is

11  subject to the California Contractor Licensing statute."

12  Frontier asserts, without citation to authority, that

13  "architects, designers, steel manufacturers and fabricators, and

14  truckers are not a 'contractor' within the meaning of the

15  California Contractor Licensing statute."

16      The Memorandum Decision relied on the following facts:

17          On October 8, 2007, Davis obtained a bid from
            Frontier, addressed to
18          "contractors/estimators," for "pre-engineered
            bldg."   The bid is for $145,494 and further
19          states: "Erecting: We can assist you in
            erecting this structure for this price $ 70,
20          750.00."   (Stephen Davis Decl., Ex. A.).
            Stephen Davis, president of Davis, avers that
21          submission of the bid to
            "contractors/estimators" typically means that
22          the proposal went to all of the generals that
            were bidding the job."   (Id., ¶ 4).   Davis
23          was the low bidder and was awarded the job by
            the School District and listed Frontier as
24          one of the subcontractors (Id., ¶ 5).   By
            letter dated December 7, 2007, Davis notified
25          Frontier of its intent "to issue a
            subcontract to Frontier ... in the amount of
26          $145,494.00 for Pre-Engineered Metal Building

in accordance with the Plans and
Specifications by BFGC Architects Planners
Inc., and Addendums No. 1 thru 5." (*Id.,* Ex.
B).  Mr. Davis avers:

> 7.  Thereafter, on December 13,
> 2007, Davis Moreno sent to Frontier
> ... a Purchase Order for the steel
> dated December 11, 2007, attached
> as Exhibit C.  On January 10, 2008,
> Davis Moreno received a modified
> Purchase Order by fax transmission
> from Frontier ... This document is
> attached as Exhibit D.  On the same
> day, I signed a Purchase Order,
> subject to the conditions set forth
> in my letter I wrote to Miranda
> Bresnick at Frontier ... outlining
> what Davis Moreno was agreeable
> relative to the Purchase Order.  A
> true and correct copy of the letter
> and signed Purchase Order are
> attached as Exhibit E.

Exhibit C to Mr. Davis' declaration, the
initial Davis Purchase Order contains no
forum selection or choice of law provision.
The initial Davis Purchase Order states:

> Furnish:
>
> Complete per plans, specifications,
> <u>Specification Section 13122 Metal</u>
> <u>Building Systems</u> including any and
> all addendums as prepared by BFGC
> Architects Planners Inc. and as
> called for Kern HSD Records
> Retention Facility Project

for a total amount of $145,494.00.  The
initial Davis Purchase Order does not specify
that Frontier would also erect the building.

Exhibit D to Mr. Davis' declaration, the
Frontier Purchase Order, faxed to Davis by
Frontier in response to Davis' December 13,
2007 Purchase Order, contains the following
provision:

> This PURCHASE ORDER shall be
> construed and enforced under the

15

laws of the state of Colorado ...
Purchaser consents to the exclusive
jurisdiction of the district court
in and for the county of Douglas,
State of Colorado.  No actions may
be commenced other than in the
district court, County of Douglas,
State of Colorado.

The Frontier Purchase Order also stated:

Supply as follows:

...

1.0 Primary and Secondary Steel

2.0 Standing Seam Rod Panels 24"
Coverage 24 GA

3.0 Metal Panels at the Roof
Mechanical Screen

4.0 Steel Framing for Mechanical
Screen

5.0 Mansard Rigid Frames

6.0 Metal Deck on Mansard Frames

7.0 Soffit Structure at Overhangs

8.0 6" Metal Stud and Parapet
Framing

9.0 Internal Gutters

10.0 Gutters and Downs

11.0 Full Trim Package

for an amount due of $145,494.00.  There is
no mention in the Frontier Purchase Order
that Frontier would also erect the building.
The Frontier Purchase Order states:

It is the building's purchaser's
responsibility to obtain
experienced personnel, proper tools
and equipment to erect this
building in a safe competent and

16

professional manner.

Exhibit E to Mr. Davis' declaration is the January 10, 2008 letter from Davis to Frontier concerning the "final purchase order" for the Project, and stating that "[t]hese following clarifications, based on our discussion, shall also be made part of the terms of the final purchase order."  The January 10, 2008 letter states in pertinent part that Davis will sign the Purchase Order provided by Frontier, instead of the Purchase Order provided by Davis, "with the following provisions" that "paragraph 6 will be changed to assert that the prevailing jurisdiction for any legal action filed will be determined by the complaining party."   The January 10, 2008 letter concluded:

> Your quote also asserted that you would provide a building erector for the sum of $70,750.00.  After receiving quotes from the recommended erectors, we are now faced with quotes that exceed your originally quoted amount by over 10%.  As discussed during our conversation, DMCI though disappointed that your original quote is now being exceeded, would absorb this cost increase.  This again is being done in the spirit of cooperation.  We expect that Frontier Steel will accept our final revisions to the purchase order, and proceed with the timely submission of shop drawings as required and promised.  We also request that Frontier Steel take all steps to incur timely fabrication and delivery of the product as we discussed.

Mr. Davis avers that, "[a]fter Frontier received my letter of January 10, 2008, they proceeded to perform under the agreement, which included the agreement as to how jurisdiction would be established."

From the Court's research, California Business and

17

Professions Code § 7045 provides:

> This chapter does not apply to the sale or installation of any finished product, materials, or articles of merchandise that do not become a fixed part of the structure, nor shall it apply to a material supplier or manufacturer furnishing finished products, materials, or articles of merchandise who does not install or contract for the installation of those items ....
>
> ...

California Business and Professions Code § 7052 provides that "[t]his chapter does not apply to any person who only furnishes materials or supplies without fabricating them into, or consuming them in the performance of, the work of the contractor."

In *WSS Industrial Construction, Inc. v. Great West Contractors, Inc.*, 162 Cal.App.4th 581 (2008), WSS, a steel subcontractor, sued the general contractor, Great West, to recover for work WSS performed under a subcontract with Great West for improvements on a public works project.  WSS submitted a bid proposal to Great West to perform steel construction work on the project.  At the time WSS submitted its bid it had applied for but not yet obtained a corporate contractor's license.  The bid proposal was subsequently incorporated into a subcontract with Great West.  Among other issues raised on appeal, WSS argued that the drafting of shop drawings and ordering of anchor bolts was not work performed under the contract, but prefatory tasks for which the corporation was not required to be licensed.  162 Cal.App.4th at 592.  The Court of Appeal rejected the argument:

> WSS prepared shop drawings detailing the

18

steel work it intended to perform on the
project and specifying 'how [it was] going to
build the canopies,' and submitted those
drawings to the project architects and
engineers for approval.  A contractor
includes one who, like WSS, 'offers to
undertake ... or purports to have the
capacity ... or submits a bid' to do specific
acts defined by statute as work engaged in by
a contractor, including the construction,
alteration or repair of any part of any
building, structure or project.  (§ 7026.)
Shop plans constitute such an offer or bid.
Through them WSS purported to possess the
capacity to undertake the steel work and
construction it proposed to perform on the
project within the meaning of section 7026,
and thus was acting as a contractor.  WSS was
required to possess a contractor's license
when its submitted its shop plans specifying
the scope of the structural steel
construction it intended to perform on a
public works project.  (See §§ 6737.3
[exempting *licensed* contractors from
requirements applicable to civil engineers
for, among other things, designing structures
for work the contractor is to perform and
supervise, in accordance with construction
industry standards and codes and within his
or her license classification, and for the
*preparation of shop* or field *drawings for
work he or she has contracted to perform*],
6731 [defining scope of civil engineering].)
The public has a right to expect the party
designing such plans - the improper
implementation of which could have serious
consequences at a school for deaf children -
will, at a minimum, have the qualifications
required and to possess a valid contractor's
license.

The same logic negates WSS's assertion it was
not required to be licensed to order
materials meant to be incorporated in the
ultimate construction, or because it did not
perform the steel galvanization itself, but
coordinated and oversaw that process which
was actually performed by a third party
vendor.  'Section 7026 plainly states that
both the person who provides construction
services himself and one who does so "through

19

others" qualifies as a "contractor." The
California courts have also long held that
those who enter into construction contracts
must be licensed, even when they themselves
do not do the actual work under the contract
... Indeed, if this were not the rule, the
requirement that general contractors be
licensed would be completely superfluous.'
... The reason contractors must be licensed
even if they hire subcontractors to do the
actual work is so that the public is
protected, '"against persons who are
unqualified to perform the required work."'
... The same reasoning governs the services
subcontractor WSS provided in ordering and
overseeing the preparation of materials
ultimately intended to be incorporated in the
project, i.e., to become 'part of an
integrated whole.' ....

*Id.* at 592-593.

Here, Frontier agreed to provide a Pre-Engineered Metal
Building, pursuant to plans and specifications prepared by BFGC
Architects Planners Inc.  Frontier's agreement provided that
Frontier would prepare shop designs and provide materials for the
pre-engineered metal building.  Frontier and Davis did not agree
that Frontier would erect the building.  However, *WSS Industrial
Construction, Inc.* negates Frontier's contention that it was not
required under these circumstances to be a licensed contractor.
Consequently, Frontier is not entitled to reconsideration on this
ground.

Frontier moves for reconsideration of the denial of
Frontier's motion to transfer the action to the United States
District Court pursuant to the doctrine of *forum non conveniens*
on the ground that "there is insufficient evidence to support the
application of the Contractor Licensing statute policies to this

1  case."  However, for the reasons stated above, Frontier is

2  subject to California's contractor's licensing provisions.

3       Frontier also argues that the Court should reconsider the

4  factors of cost and availability of process.   The Memorandum

5  Decision stated:

6           As to the differences in the costs of
            litigation in the two forums, this factor
7           weighs in favor of Davis.  Davis' list of
            prospective witnesses is substantially larger
8           than that of Frontier.

9           As to the availability of compulsory process
            to compel attendance of unwilling non-party
10          witnesses, this factor weighs in favor of
            Davis because Davis has listed more non-party
11          witnesses than Frontier, who lists only one.

12      Frontier argues that the factor of costs should be

13  reconsidered in Frontier's favor:

14          The relative circumstances of Frontier and
            Davis Moreno render the costs a more
15          significant factor for Frontier as a small
            operation than for Davis, even though Davis'
16          costs may be somewhat greater with more
            witnesses.  Trial in California, and its
17          costs ... place Frontier at a 'severe
            disadvantage' compared to its opponent.
18
        Frontier is not entitled to reconsideration of this factor.
19
    All of this was known, the alleged economic extremis of Frontier
20
    was emphasized and fully considered by the Court in denying
21
    Frontier's motion for transfer pursuant to *forum non conveniens.*
22
    Litigation in the United States District Court for the District
23
    of Colorado will cost more for Davis than litigation in
24
    California will cost Frontier.
25
        Frontier argues that the factor of availability of process
26

                                    21

should be reconsidered in Frontier's favor "because of the
conveniences of modern litigation and because Davis' additional
witnesses represent the owner of the project, the school
district."

Frontier is not entitled to reconsideration of this factor.
Kern Unified School District is not a party to this litigation
and its employees are non-party witnesses.  This is a public
entity dependent on public funds that will be subjected to
greater litigation expense.  Davis listed three other non-party
witnesses who are not employees of Kern Unified School District.
Reconsideration on this ground is inappropriate.

Frontier moves for reconsideration of the denial of
Frontier's motion to dismiss for lack of personal jurisdiction.

The Memorandum Decision ruled:

> Davis has established purposeful availment by
> Frontier because, although Frontier's bid was
> in response to Davis's solicitation of
> subcontractor bids for the Project, Frontier
> knowingly and intentionally shipped its
> product to California for inclusion in the
> Project.  By shipping its product to
> California for inclusion in the Project,
> Davis [sic] obtained the protections of the
> laws of California pertaining to the rights
> of subcontractors.

To some extent, Frontier's motion for reconsideration
appears to challenge the underlying merits.  Frontier contends
that its declarations and evidence in support of the motion to
dismiss establish that Frontier did not offer to construct and
erect the building and that there is no evidence of strict time
requirements or delays to rebut Frontier's evidence of

performance of the contract.  The Memorandum Decision did not base its decision on Frontier's agreement to erect the building, specifically stating: "The evidence does not establish that Frontier and Davis agreed that Frontier would erect the building."  (Doc. 37, 22:26-23:1).  Whether or not Frontier breached the contract by alleged delay in compliance with its terms does not negate Frontier's contact with the forum, i.e., that it shipped its product to California for inclusion in a California public works project.

Frontier contends that Davis's claims arise out of contract, not tort.  Frontier asserts:

> It is not a case of a corporation placing its products into the stream of commerce for the use of general consumers.  It is a bargained for service and supply contract.  All of the material allegations of the complaint have been controverted by affidavit and the affidavits of Frontier have not been rebutted by affidavit by Davis.  It is distinguishable in that it is a supply and professional services contract; not a standard construction subcontract for services on-site.  Indeed, it is not a subcontract at all.  At the hearing on February 2, 2009, Davis confirmed that its contract with Frontier did not incorporate Davis' own contract with the Kern Unified School District.

Frontier argues that the line of cases most analogous are those involving professional services and that the case which demonstrates the circumstances most analogous to this case is *Sher v. Johnson*, 911 F.2d 1357 (9th Cir.1990).

In *Sher,* federal officials arrested Sher in California in connection with criminal charges brought against him in Florida.

Sher and his wife retained Nolan, a California attorney, to assist in Sher's defense and to help Sher retain suitable Florida counsel to try the case.  Sher and Nolan flew to Florida and interviewed numerous attorneys, settling on a Florida law partnership.  The law firm was a Florida partnership and all the individual defendants were Florida residents, licensed to practice law only in Florida.  At a meeting at the Tampa Airport, Sher gave Johnson, the lead Florida attorney, a retainer check. Later, Johnson sent a letter to Sher in California detailing the retainer agreement, which Sher signed and mailed back to Johnson in Florida.  During the course of the representation, the partnership sent bills to the Shers in California; Mrs. Sher sent checks to the partnership, drawn on a California bank, in payment for legal services.  To secure these payments, and pursuant to the retainer agreement, the Shers executed a deed of trust and promissory note in favor of the partnership, encumbering the Shers' Los Angeles residence.  Nolan held the deed of trust, but the deed of trust was not recorded.  Johnson traveled to California to meet with the Shers or Nolan on three occasions. He was the only partner to travel to California in connection with Sher's defense.  Johnson and another partner made several phone calls to the Shers in California and sent them various communications by mail.  A federal jury in Tampa convicted Sher of extortion and several RICO violations.  At the time of Sher's trial, Johnson was being investigated for violations of the Hobbs Act by the U.S. Attorney's Office that prosecuted Sher.  Johnson

did not disclose this fact to Sher and Sher did not discover the

investigation until after his conviction.   The Eleventh Circuit

reversed Sher's conviction on several grounds, including that

Johnson's conflict of interest between defending Sher and

defending himself violated Sher's right to competent counsel.

The Shers filed a complaint for legal malpractice against

Johnson, other individual partners, and the partnership in the

Central District of California.   The district court dismissed the

action for lack of personal jurisdiction.   The Ninth Circuit

ruled that personal jurisdiction over the partnership in

California existed:

> Although some of Sher's claims sound in tort,
> all arise out of Sher's contractual
> relationship with the defendants.   In such a
> case, the mere existence of a contract with a
> party in the forum state does not constitute
> sufficient minimum contacts for jurisdiction.
> *Burger King*, 471 U.S. at 478 ... Instead, we
> must look to 'prior negotiations and
> contemplated future consequences, along with
> the terms of the contract and the parties'
> actual course of dealing' to determine if the
> defendant's contacts are 'substantial' and
> not merely 'random, fortiutous, or
> attentuated.' ....
>
> Here, it is undisputed that a Florida law
> firm represented a California client in a
> criminal proceeding in Florida.   As normal
> incidents of this representation the
> partnership accepted payment from a
> California bank, made phone calls and sent
> letters to California.   These contracts, by
> themselves, do not establish purposeful
> availment; this is not the deliberate
> creation of a 'substantial connection' with
> California ..., nor is it the promotion of
> business within California.   For one thing,
> the business that the partnership promoted
> was legal representation in Florida, not

25

California.  Moreover, the partnership did
not solicit Sher's business in California;
Sher came to the firm in Florida.  There is
no 'substantial connection' with California
because neither the partnership nor any of
its partners undertook any affirmative action
to promote business within California.

...

... Out-of-state legal representation does
not establish purposeful availment of the
privilege of conducting activities in the
forum state, where the law firm is solicited
in its home state and takes no affirmative
action to promote business within the forum
state.  This, of course, is not the end of
the matter; the Shers allege several
additional contacts between the partnership
and California.  For example, on three
occasions Johnson traveled to Los Angeles to
meet with the Shers and Nolan in connection
with the partnership's representation of
Sher.  Even this action, however, when
combined with the firm's underlying
representation of a California client, does
not constitute purposeful availment of the
privilege of conducting activities within
California.

The trips to California were incident to the
Florida representation.  It may be said, of
course, that by coming to California in
connection with the representation, the
partnership conducted its business in that
state.  We do not believe, however, that in
the context of the 'parties' actual course of
dealing,' ... the partnership was availing
itself of any significant California
privilege by coming into the state to talk to
its client.  The three trips to California
were discrete events arising out of a case
centered entirely in Florida; they appear to
have been little more than a convenience to
the client, who would otherwise have had to
travel to Florida.  We find these contacts
too attenuated to create a 'substantial
connection' with California.

The same cannot be said when we consider in
addition the deed of trust.  To secure the

1    partnership's payment for Sher's legal
     representation, the Shers executed a deed of
2    trust in favor of the partnership,
     encumbering the Shers' California home.  By
3    requiring the execution of a deed to
     California real estate, the partnership was
4    looking to the laws of California to secure
     its right to payment under its contract with
5    Sher.  The execution of the deed
     'contemplated [significant] future
6    consequences' in California; perfection of
     the partnership's security interest would
7    require filing in the California recorder's
     office; judgment on the deed would require
8    the application of California law;
     enforcement of such a judgment would require
9    the action of a California court.

10   The deed represented a significant contact
     with California.  We need not decide,
11   however, whether standing on its own, the
     deed would constitute a 'substantial
12   connection' with California for
     jurisdictional purposes.  For, looking at the
13   partnership's entire 'course of dealing' with
     the Shers related to this contract, including
14   the calls and letters, the trips and the
     deed, we conclude that the partnership
15   'invok[ed] the benefits and protections' of
     the laws of California for purposes of
16   jurisdiction.

17   *Id.* at 1362-1364.  However, the Ninth Circuit ruled that personal

18   jurisdiction over the individual partners in California did not

19   exist:

20   The Shers contend, without benefit of case
     support, that because the liability of the
21   partnership would establish joint and several
     liability of each individual partner ...,
22   jurisdiction over the partnership establishes
     jurisdiction over the partners.  The Shers
23   are wrong.  Liability and jurisdiction are
     independent.  Liability depends on the
24   relationship between the plaintiff and the
     defendants and between the individual
25   defendants; jurisdiction depends only upon
     each defendant's relationship with the forum
26   ... Regardless of their joint liability,

27

> jurisdiction over each defendant must be
> established individually.
>
> ...
>
> ... In this case, the district court has
> jurisdiction over only those individual
> partners who personally established the
> requisite minimum contacts with California.
>
> There are no such partners.  Johnson
> represented Sher, a California resident, made
> phone calls and sent letters to California in
> the course of the representation, and
> traveled to California on three occasions to
> service his client.  He was not, however, a
> beneficiary of the deed of trust; only the
> partnership was.  Such contacts alone do not
> constitute purposeful availment in California
> ....
>
> There is also no jurisdiction over Hayes and
> Paniello.  Hayes represented a California
> client, and made phone calls and sent letters
> to California during the course of the
> representation, but he had no other relevant
> contacts with the state.  Paniello had no
> involvement with the Sher representation;
> indeed, he wasn't even part of the firm
> during much of the representation.  As there
> is no jurisdiction over Johnson, there is ...
> no jurisdiction over Hayes or Paniello.

*Id.* at 1363-1364.

Frontier argues that it stands in the same shoes as the

individual partners in *Sher*.  Frontier contends:

> To paraphrase the Court in *Sher*, out-of-state
> engineering services do not establish
> purposeful availment of the privilege of
> conducting activities in the forum state,
> where the firm is solicited in its home state
> and takes no affirmative action to promote
> business within the forum state.
>
> Here, Frontier was solicited on the internet
> by Kern Unified School District its potential
> general contracts including Davis [sic].
> Here, the contract was consummated in

28

1
2
> Colorado.  Here, Davis has offered no
> evidence that Frontier took affirmative
> action to promote business within California.

3     Frontier is not entitled to reconsideration on this ground.

4  This case law was available to cite, but adds nothing to the

5  analysis.  Frontier agreed to provide a Pre-Engineered Metal

6  Building, prepare shop designs and provide materials for the pre-

7  engineered metal building to be delivered for a public works

8  project in California.  *Sher* is not analogous.

9     Frontier again cites *Lakeside Bridge & Steel Co. v. Mountain*

10  *State Constr. Co.*, 497 F.2d 496 (7th Cir.1979), *cert. denied*, 445

11  U.S. 407 (1980), for the proposition that delivery of steel does

12  not support personal jurisdiction.  The Memorandum Decision fully

13  addressed *Lakeside*; the Court reached a different conclusion.

14  Frontier merely reiterates an argument previously made and

15  rejected by the Court.

16     Finally, Frontier argues that the reasonableness prong of

17  the specific jurisdiction test should be reconsidered "on the

18  basis that California's Contractor Licensing statute is not

19  properly before this Court."  For the reasons stated above, this

20  ground for reconsideration is without merit.

21     For the reasons stated, Frontier's motion for

22  reconsideration is DENIED ON ALL GROUNDS.

23     IT IS SO ORDERED.

24  Dated:   **November 9, 2009**              **/s/ Oliver W. Wanger**
                                         UNITED STATES DISTRICT JUDGE
25
26

29